IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA              )
                                      )
v.                                    )              NO. 08CR30027-MAP
                                      )
MICHAEL J. ARMITAGE                   )



## MICHAEL J. ARMITAGE'S SENTENCING MEMORANDUM

Michael J. Armitage ("Armitage"), through counsel, files the instant sentencing memorandum in support of a sentence below the advisory guideline range. Armitage respectfully requests that this Honorable Court exercise its discretion to impose a sentence "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. §3553(a).

## I.     BACKGROUND

Armitage was a law-abiding citizen and had no criminal record before committing the charged acts of fraud and tax evasion. On April 2, 2009, Armitage was charged in a fifty-nine count Superseding Indictment which also named Christopher D. Willson ("Willson") and EV Worldwide, LLC ("EVW"). Armitage was charged with three counts of False Statements to a Federally Insured Financial Institution, in violation of 18 U.S.C. §1014 (Counts 1s through 3s); three counts of Bank Fraud, in violation of 18 U.S.C. §1344 (Counts 4s through 6s); fifteen counts of Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. §1957(a) (Counts 7s and 46s through 59s); three counts of

Tax Evasion, in violation of 18 U.S.C. §7201 (Counts 8s through 10s); seven counts of False Statements to Federal Official, in violation of 18 U.S.C. §1001(a)(2) (Counts 11s, 12s, and 41s through 45s); five counts of Willful Failure to File Tax Return, in violation of 26 U.S.C. §7203 (Counts 13s through 17s); one count of Conspiracy, in violation of 18 U.S.C. §371 (Count 18s); nine counts of Wire Fraud, in violation of 18 U.S.C. §1343 (Counts 19s through 27s); one count of False Claims Conspiracy, in violation of 18 U.S.C. §286 (Count 28s); seven counts of False Claims, in violation of 18 U.S.C. § 287 (counts 29s through 35s); and five counts of Endeavors to Obstruct Federal Audit, in violation of 18 U.S.C. §1516(a) (Counts 36s through 40s). Armitage was also named in a Forfeiture Allegation, pursuant to 18 U.S.C. §§981 & 982, and 28 U.S.C. §2461(c). On October 20, 2010, Armitage pled guilty to Counts 1s through 3s, 8s through 11s, 18s, 29s, and 37s of the Superseding Indictment. Pursuant to the plea agreement, following sentencing the government will move to dismiss Counts 4s through 7s, 12s through 17s, 19s through 28s, 30s through 36s, and 38s through 59s of the Superseding Indictment.

Armitage was and is a hardworking self-made entrepreneur whose success was solely the result his own tenacity and ability to take risks in his business endeavors. Armitage was always deeply involved in the communities he lived in and a committed parent. For example, in 1999 Armitage bestowed a gift of $150,000 in the name of his daughter Madalyn to Springfield Technical Community College for their computer center. Armitage was the catalyst and the engine that developed a 254 mgw gas fired electric generating power plant in Agawam, MA at a cost of over $400 million dollars. Many believed he was visionary in his business endeavors, however, his success did attract jealousy and undue criticism from many simply because of his success. Armitage asks the Court to consider not just his criminal acts, but also

his lack of a criminal record, his mental and physical condition and his genuine desire to make full restitution.

Armitage was born in Minneapolis, Minnesota on October 12, 1953. He is the second of seven children born to the marital union of John and Dolores Armitage. Armitage was raised in Minneapolis until age seven, when the family moved to Springdale, Ohio, a small town outside of Cincinnati. Armitage was raised in an emotionally unstable environment. His father was a strict, mean person who was verbally and physically abusive towards his children. His father focused his rage and violence on Armitage and his brother Mark. Armitage's father worked long hours and, when he was home, all the children avoided him. His father was also verbally and physically abusive towards his mother and Armitage. At age fourteen, Armitage ran away from home and lived at a friend's in Cincinnati. As a teenager, he began working at a movie theater and was quickly promoted to manager. Eventually he purchased the movie theater and managed the business on his own. He saved his money and, at age sixteen, established an apartment of his own in Springdale, Ohio. Armitage moved to St. Louis, Missouri, at the age of twenty for employment purposes. Employment opportunities then brought him to four different cities in an eighteen month span: Des Moines, Iowa; Cincinnati, Ohio; back to Iowa; then Lincoln, Nebraska. Armitage had not seen or spoken to anyone in his family until his brother passed away in 1976 at which time he reconnected with his family, but it has always been a strained relationship. While Armitage was working in Lincoln, Nebraska, the company for which he worked was purchased by another company, which led Armitage to move to Minneapolis, then to Denver, back to Des Moines, followed by a move to Houston, Texas.

In 1981, Armitage began his own company, Super Optical Stores and opened up three Eye World locations: Denver, Houston, and Atlanta. In 1984, he sold this company to the Quaker

Oats company and retired.   Armitage soon became restless and began looking for new opportunities.  Armitage read in the Wall Street Journal that energy was being de-regulated and soon it would be permissible for private individuals to own and operate power companies.   Armitage believed energy to be a recession-proof industry, so he joined up with Bill Williams and they formed Altresco and purchased a power and steam plant in Pittsfield, Massachusetts. In 1987, Altresco reached an agreement with General Electric to supply their power and steam.

In 1986, Armitage and Christine Mock were married in a civil ceremony in Denver, Colorado.  Armitage and his wife had one child together: Benjamin Armitage, age 22, currently residing in Fort Myers, Florida and attending Florida Gulf Coast University.

Armitage states that, after forming Altresco, he was away from home forty-four weeks out of the year negotiating contracts and building clientele.   As a result, Armitage and his wife grew apart, their communication broke down, and in 1990 the two separated.   While he was on a business trip, Christine moved back to Lincoln, Nebraska, and, after realizing their marriage was over, Armitage moved into an Altresco apartment in Boston, Massachusetts.   In 1993, their divorce was finalized and Christine had primary custody of their son while Armitage was to pay support and his son stayed with him one weekend per month and several weeks each summer.  In 1992, Armitage sold his interest in Altresco and established a residence in Boston, Massachusetts.

In 1997, Armitage married Melissa Reder in a civil ceremony in Block Island, Rhode Island.   They had two children together ages 12 and 11.   In 2000, Armitage and his wife purchased a home in Somers, Connecticut.   In 2004, Armitage and his wife built a home on Eastbrook Lane in Pittsfield, Massachusetts, which is where his wife had grown up with her

family.   In 2007, partly as a result of all the negative media, Armitage moved and built a home in Fort Myers, Florida, where he resides to this day.

From approximately 1993 through 2006, Armitage was a local entrepreneur and financier who founded and directed, among other entities, the following privately held businesses: Power Development Co., LLC , which financed and developed power plants in Western Massachusetts, Connecticut and elsewhere, which at one point had over one billion in construction; Venture Properties, LLC , which developed real estate in downtown Springfield, Massachusetts; and United States Venture Group, LLC, a venture capital firm that invested primarily in Electric Vehicles Worldwide, LLC and its subdivision Electrastor, LLC, two companies that obtained federal funds to develop an electric-powered bus and battery.

### 1.  *The Founding of EVW, LLC.*

In 1999 Armitage acquired a controlling interest in EVW and subsequently served either as its CEO or President through 2006.  In November of 2000, Christopher D. Willson was hired by EVW and subsequently served either as its Chief Scientist or Senior Vice President through 2006.  Between August 2000 and December 2005, EVW sought and received approximately $4.25 million in federal grant funds.  The initial grant was for the development of an electric bus and the grant was revised later for the development of a battery that would power a hybrid bus, through cooperative agreements between the Pioneer Valley Transit Authority ("PVTA") and the Federal Transportation Administration ("FTA").  Despite significant investments of both his time, expertise and cash by Armitage personally and significant expenditures of private and public funds EVW was able to make inroads in developing the technology and in fact was able to develop a proto type battery.

During the grant period and as the ultimate recipient of the federal funds, EVW was required to follow certain rules or regulations.   The grant operated on a reimbursable basis: the FTA paid EVW through the PVTA only after EVW had actually incurred its costs.   EVW could only seek federal reimbursement for half of its expenses, that is, EVW had to match the FTA's share with funds that it obtained from non-federal sources (private investment or state grants). Third, EVW could only bill the FTA for eligible or allowable costs (costs that were related to the project, reasonable, procured properly, and adequately documented).   The grant was set up so that EVW billed the FTA for expenses attributable to specific milestones, or achievements. To receive the federal money, EVW submitted invoices to the PVTA, which forwarded them to the FTA.   Only after the invoices were audited and approved by both the FTA and the PVTA did the FTA provide funds to the PVTA, which distributed the money to EVW.

The PVTA and the FTA each separately had the responsibility to certify that the EVW invoices contained a complete and accurate statement of EVW's actual expenses that were eligible for federal reimbursement and that EVW was continuing to provide its 50% share of local funds.  Armitage rightfully assumed that because Armitage's staff and both the FTA and PVTA reviewed and approved all EVW submittals that EVW had complied with the grant requirements.  Unknown to Armitage and his staff, both entities (now allegedly) simply assumed that whatever was submitted was accurate.  According to representatives from both the PVTA and the FTA, neither monitored EVW's business operations and instead, the agencies simply processed all of EVW's invoices without reviewing whether EVW technically complied with the grant requirements.   Although EVW initially obtained significant private funding and a promising license for battery technology, the company eventually encountered both substantial technical difficulties  and an inability to obtain continued funds to meet cash flow and grant

requirements.   However, Armitage always believed that EVW was compliant with the grant requirements and had either the FTA and/or PVTA properly reviewed the submittals and brought to the attention of Armitage any errors and/or improperly submitted material, he would have corrected it and/or not accepted the funds.   It is noteworthy that the administration of the grant is very technical and that both Armitage and Willson were inexperienced in dealing with Federal grants.   By the spring of 2003, EVW's financial difficulties resulted in the termination of a significant portion of its technical staff, and the company was accumulating significant debts to contractors such as Ergenics (its technology licensor) and Belcan (its equipment supplier). Nevertheless, Armitage, the consummate entrepreneur, continued to invest significant amounts of his own time and money to furtherance of the battery's development by EVW.

In March 2003, as a result of a lack of adequate cash flow (a common problem for companies, most especially start-up development companies) EVW engaged the services of a factoring company, Commerce Funding Corp. ("Commerce Funding") which provided EVW with wire transfers of advance payment of 85% of its FTA invoices to ensure the more regular flow of funds. Eventually, the EVW invoices were processed by the governmental agencies, and the FTA paid the PVTA, which in turn paid Commerce Funding, which wire transferred any residual amounts of the 15% holdback to EVW's account.   By mid-2004, EVW had lost the ability to match the federal grant funds with its own resources.   From late 2004 through 2005, the only EVW personnel working consisted of Armitage, Willson, and two successive officer managers who mainly handled ministerial work.   During this same period, the FTA funds represented nearly the sole source of income for EVW.  In January of 2005 Armitage and Willson founded a new Canadian company, HSM Systems, Inc., which focused on the distinctly different project of developing hydrogen storage containers and which they operated first from

the  EVW premises in Pittsfield, Massachusetts, and later, from New Brunswick, Canada.

### 2. *The Operation of EVW.*

From September 2004 through December 2005, Armitage and Willson submitted a series of ten invoices (Invoices 23 through 27 of the 7050 cooperative agreement and Invoices 1-4 of the 7101 cooperative agreement) to the PVTA and FTA in order to continue the flow of federal funds into EVW.   The invoices claimed more expenses than EVW  actually incurred  during  the relevant  periods and that the FTA was only paying for no more than 50% of EVW's eligible expenses.   Some of EVW's actual expenses consisted of payments to Armitage and/or his credit cards and payments to or on behalf of HSM.   Armitage honestly believed that because of his personal contributions to EVW (totaling over 1.4 million dollars) that those expenditures were repayments of loans and/or deferred salary payments.    Armitage's belief was reasonable especially in light of his past experience and practice in developing other companies.

FTA regulations required,  among  other things, that all project costs be supported with documents such as "properly executed payrolls, time records, invoices, contracts, or vouchers describing in detail the nature and propriety of the charges," and that  such  documents  be available  for  inspection.    Although,  EVW failed to maintain adequate records for most of its later invoices,  particularly  those  in  2005, it is clear that Armitage and Willson devoted substantial time to EVW's efforts to develop the hydrogen battery.   As often happens with development companies as funds run low and the staff diminished many of the administrative details are not done.

In  the  spring  of  2006,  DOT  OIG  auditors  visited  EVW  to  review  grant  programs administered by the PVTA.   Armitage  and/or Willson spoke to the auditors about material aspects of the grant's operation, because they believed they had done nothing wrong and EVW

had satisfied its matching fund requirement.

EVW's project-related costs also began to mount, and EVW fell into substantial debt to two principal vendors: Ergenics, which licensed its battery technology to EVW, and Belcan, which designed a manufacturing process for the battery. By late 2004, EVW had laid off all of its employees except for Armitage, Willson, and two successive assistants had incurred repeated negative bank account balances, and owed substantial sums in vendor bills, legal fees, accounting fees, and back rent.

By the middle of 2004, EVW was in serious debt and as a result of cash flow issues it was unable to satisfy Belcan which was in possession of EVW's battery equipment. Belcan refused to continue work on the battery which substantially interfered with EVW's ability to advance the project. Armitage continued to work at resolving the Belcan issue and finally by the spring of 2005, he successfully negotiated an agreement for the return of the equipment and it was returned to Pittsfield in April of 2005.

Ergenics had developed a prototype nickel-hydrogen battery for placement in an electric vehicle. In 2000, Ergenics licensed its battery technology to EVW for commercialization in pure electric vehicles, for which EVW paid a $500,000 license fee. In 2001, Ergenics licensed its battery technology to EVW for commercialization in hybrid vehicles and certain electrical applications, for which EVW paid $500,000, and for all other applications, for which EVW was supposed to pay another $500,000. Unfortunately, EVW was unable to pay in full the third license fee of $500,000. In addition, EVW was also unable to pay hundreds of thousands of dollars in minimum royalty payments starting in 2003, to preserve the exclusivity of all three licenses. In 2003, Armitage explained to Ergenics that EVW did not have the money to pay the third payment on royalty fees. In an effort to move EVW forward, on September 29, 2004,

Armitage believed he successfully negotiated with Ergenics that in exchange for the loss of EVW's first two exclusive licenses as well as a loss of the entire third license due to non-payment, Ergenics' waived of all other payments owed.

Subsequently Invoice 26, included a $477,750.00 licensing fee to Ergenics as a reimbursable expense that EVW incurred in December 2004 and also included it as an in-kind contribution from Ergenics toward EVW's matching funds.  Representatives of EVW met with PVTA every month and Armitage believed that the payment of licensing rights by EVW to Ergenics was in exchange for payment of the $477,750.00 due and thus Invoice 26 was properly submitted.  Unbeknownst to Armitage these funds did not qualify as an in-kind contribution or an expense according to the grant requirements.

By the end of 2003, EVW was also in arrears of its payments to Belcan, which retained EVW's battery equipment.  Acting without legal advice, because EVW could not afford it, Armitage and Willson believed that the stock transfer was in lieu of paying Belcan and as such was an includable contribution.

Again, in a continuing effort to move EVW forward, in April of 2005, Armitage executed an Agreement between EVW and Belcan, in which Belcan agreed to release to EVW the equipment that it had purchased and designed for EVW.  Belcan insisted that its rights with respect to the prior debt be reserved.  Even though, Armitage believed the debt to Belcan was satisfied,  he agreed to this term because it was the only way he could get the equipment back to give EVW an opportunity to move forward.

Armitage and Willson mistakenly believed that Belcan had made in-kind contributions to EVW's local share, in matching funds from Belcan.  Unknown to Armitage or Willson, EVW was required to request a deferral, reduction, or refund of EVW's local share requirement or for

permission to use in-kind resources instead of cash to satisfy its 50% share of the project costs. At no time prior to the criminal investigation was either Armitage or Willson ever informed that the Belcan funds could not be used as an in-kind contribution or be included as matching funds. Had Armitage been so advised, EVW would not have included the Belcan funds.

In January of 2005, Armitage and Willson founded HSM, which was incorporated in New Brunswick, Canada to focus on the development and commercialization of hydrogen storage containers.  Willson planned for HSM to develop a storage vessel for the hydrogen market, and for HSM to work with the University of New Brunswick. Both Armitage and Willson believed HSM's work would also result in reducing the cost of the battery and therefore benefit EVW.  During 2005, Willson and/or Armitage caused EVW to pay a total of $55,121.76 in checks and one wire transfer to the following entities for HSM's expenses.

From December 30, 2004 to February 25, 2005, EVW sent three $20,000 wire transfers totaling $60,000 to the University of New Brunswick ("UNB") for a hydrogen storage project. At his trial, Willson explained the HSM payments were justified because Armitage had loaned EVW approximately $1.4 million over the first two years of the project and thus Armitage was entitled to pay it to HSM.  Willson explained that because EVW owed Michael money, it was Michael's money, and not FTA's or EVW's money, that EVW was paying to help HSM. Willson said that the HSM payments were appropriately invoiced under the line item of "debt repayment."

On April 24, 2006, Armitage sent an e-mail (copied to Willson) to auditors Burke, Thomas, and Deutsch, attaching a "file which outlines funds invested into Electrastor, LLC as requested." The e-mail attached a spreadsheet that represented EVW's local match as $6,779,742 (i.e., more than 50% of FTA's total payments of approximately $4.3 million). The 6.7

million dollars consisted of deposits into EVW's account, plus "in-kind" contributions: (a) $900,000 from Michael in deferred salary of $12,500.00 from January 1, 1999 through December 1, 2005; (b) $477,000 from a source on December 1, 2004; and (c) $236,353.00 from a source on June 1, 2005.

On May 31, 2006, the FTA sent an e-mail to Willson and Armitage, seeking confirmation that the $477,000 licensing fee in invoice 26 (actually, $477,750.00) was waived by Ergenics as part of a settlement and requesting the sources of the two unidentified in-kind contributions. In a reply that same day Willson answered by stating his understanding, "The $477,000 is part of the Ergenics settlement.   It is also the same $477,000 in-kind contribution referenced in your question. . . . The second in-kind contribution is the cost of the actual hardware that is incorporated in the equipment designed for battery fabrication.  As we discussed during your visit, it is listed as in-kind because Electrastor stock was transferred to Belcan in exchange for the transfer of equipment to Pittsfield."

Armitage deferred $900,000 salary as an in-kind contribution.   This amount included his regular monthly deferrals from November 1, 1999 through April 1, 2002 (and beyond); however, during this same period EVW issued Armitage payroll checks totaling $59,250.00: so his actual salary deferral was $840,750.00.  Also during this same period payments of $287,000.00 were made to Armitage and/or on his credit cards.  It is really form over substance as Armitage had loaned approximately $1.4 million to EVW and clearly the payroll payments and other payments to Armitage together added to the deferred salary (total $346,250.00) are less than the funds loaned by Armitage.  Armitage believed his actions were proper as he had completed the same process on other projects he participated in over the years.  He would contribute substantial sums of his own money and time into the furtherance of a project's success and during the project he

12

would tap into the project's resources to fulfill personal obligations; not with the intention of stealing but with the intention of reimbursement.   Armitage had always been poor at attention to detail and procedures, unfortunately with the Federal Grant requirements his actions became criminal.

### 3. Armitage Taxes and Mortgages.

The IRS received information that PDC had paid Armitage approximately $112,500, $172,500, and $216,000 in tax years 1995, 1996, and 1998.  On April 26, 1999, the IRS assessed $3,454.00 for tax due and owing for tax year 1995. On October 11, 1999, the IRS assessed $18,426.00 for tax due and owing for tax year 1996. On August 20, 2001, the IRS assessed $44,090.00 in tax due and owing for tax year 1998.  For a total for all three years of **$65,970.00**.

In late 1999, Armitage agreed to sell 13% of his interest in PDC for $2.6 million to Z-Electric, LLC, which was an investment group organized by another PDC partner, Michael Zarin.  For this sale, Armitage received payments totaling $2 million in 1999 and payments totaling $500,000 in 2000, and he received the remaining payments in 2002, 2004, 2005, and 2006. According to PDC's records, between 2002 and 2006, Armitage received a total of $1,807,091.92 from PDC in distributions of partner income, most of which was used to reduce his debt to PDC.  Although these payments were taxable to Armitage as income, he did not actually receive the majority of the funds, but nevertheless was obligated to pay the taxes.

Between 2001 and 2003 Armitage obtained three loans from United Cooperative Bank. On April 24, 2001, Armitage obtained a $975,000 commercial loan for VP, the real estate company that he co-owned and operated.  On April 24, 2002, Armitage obtained a $170,000 commercial loan for VP.  United Bank was provided a signed 2001 joint tax return dated March 15, 2002 but this return was never filed with the IRS.  Armitage has no memory of ever

providing United Bank with the 2001 tax return, nor is there any evidence that he did. Customarily Armitage would have his employees follow up with the bank and provide any requested documents.   Armitage's best recollection was that Ralph Coviello, the office manager at the time, had experience with preparing tax returns and prepared the return.

Finally on July 16, 2003, Armitage obtained a $400,000 residential loan to refinance his home at 1 Eastbrook Lane, Pittsfield, Massachusetts.   **ALL THREE OF THE LOANS PROVIDED BY UNITED BANK WERE PAID AND RESULTED IN NO LOSS TO THE BANK.**

On September 24, 2004, RO McGrath served notices of levy to Administaff (the payroll processing company for PDC), United Bank and Berkshire Bank.

After seeing a television ad, on October 13, 2004, Armitage met with a tax representative Marc Dombrowski of Tax Help Associates ("THA"), which was based in Buffalo, New York, and authorized THA to represent him before the IRS with respect to tax years 1994 to 2004. Armitage informed Dombrowski that he had not filed any returns for a number of years and that the IRS had levied some bank accounts.   Dombrowski informed Armitage that he would communicate with RO McGrath and assist Armitage with his tax matters.   In order to complete his tax returns, Armitage needed to obtain and provide Dombrowski with additional information which he simply failed to do as he became side tracked with his business endeavors.

On April 15, 2005, RO McGrath unexpectedly encountered Armitage at this Pittsfield home and informed him the IRS would put a levy on his house.   Despite Armitage's knowledge of the potential levy he made no effort to transfer the title to the house or further encumber it, but left it in his name figuring when he sold it he would use any excess proceeds to pay towards his taxes.   Had Armitage's true intention been to not pay his taxes he easily could have borrowed

against the house before a levy was levied.

### 4. *Armitage accepts responsibility.*

Armitage accepts responsibility for his wrongdoing and is remorseful for his conduct. He knows that his mismanagement of EVW and his evasion of paying taxes have created a severe loss to the United States Government.  He is deeply sorry for his actions and looks forward not only to expressing remorse at the upcoming hearing, but also to dedicating the remainder of his working life to making restitution to the United States. He recognizes that the desperate love he felt for his children and his deep rooted need to be successful and his  need to provide his family with the attributes of success in no way justifies his actions. He does not offer this explanation as an excuse, but only to show that he was motivated by something other than raw greed.

### 5. *FTA and PVTA's failure to supervise EVW.*

The FTA and the PVTA had a legal duty to supervise Armitage, including conducting inspections of the business and to verify and review the submission of the invoices.  Tragically, the FTA and PVTA failed to fulfill their duties and responsibilities to oversee the grants. Had they done so, the problems would have been detected sooner and Armitage would have had an opportunity to correct any errors and no fraud would have been committed.  EVW was not formed with the intention of defrauding the United States Government of grant monies.  EVW was formed as a vision of providing the Mass Transit Community with a viable alternative and clean method of transportation.  Its vision and intended purpose is noteworthy.  There were legitimate and significant attempts to make the technology work.  Those attempts failed but not without effort and determination.  Armitage expended significant sums of his personal funds to move that vision forward.  It should be noted that Armitage has personally lost in excess of one

15

million dollars as a result of the demise of EVW.   His demise was in the details and his failure to fully understand the technical aspects of the grant requirements of EVW's obligation to maintain the proper private share of expended funds.

### 6.   Armitage's Efforts at Cooperation.

Armitage met with investigators and representatives of the United States Attorney's Office on several occasions.  Towards this end, he provided those parties with complete and comprehensive information regarding their topics of inquiry.  It became readily clear to counsel during those meetings that the purpose was not to obtain relevant information regarding other criminal activities but was rather a mechanism to ensure that Armitage would lock himself into the Government's perception of a greedy entrepreneur whose sole purpose in EVW's existence was to defraud the United States Government.  Armitage did not implicate and could not implicate those individuals the government was seeking information about.  His efforts were genuine. The Government has not moved for a substantial assistance departure even though Armitage has made a good faith effort and provided all information requested of him.

### 7.   Collateral Consequences Suffered by Armitage.

Since his indictment in October 2006, Armitage has been subject to very harsh pretrial consequences. He has experienced a host of medical problems that have become worse over the past twelve months, including the determination that he suffers from several medical and psychological problems, including severe depression and syncope.  As a result of his medical treatment there is concern about his depression and his medical condition, syncope.  The latter involves sudden drops in his blood pressure that leads to his passing out.  On November 20, 2010 Armitage was hospitalized for a week after his first episode of syncope, wherein he passed out while standing, fell on his face and fractured his nose. Subsequent to this episode

diagnostic testing has, so far, been inconclusive.  During the interim period since November of 2010 the episodes have continued and became more frequent, daily or more often, during this summer of 2011.

Armitage's  Primary Care Physician, Dr. Douglas Paone, suspects the syncope is caused by the combination of psychiatric medications that Armitage is prescribed by his psychiatrist, many of which can cause hypotension.  His psychiatrist reported he is unsure about Dr. Paone's theory.  So far there is no change in the frequency of the syncope since the summer of 2010 and a recently added cardiac medication has reduced the rapidity of the onset of the symptoms, allowing him time to sit or lay down when an episode begins.

On September 5, 2011, Armitage's cardiologist started him on a 24 hr./day heart rhythm monitor, which should provide a better diagnostic understanding. The monitoring will continue until October 5, 2011.  If the conclusion is that his psychiatric medications should be changed, it will take several weeks to safely taper him off those medications, especially Parnate, an MAO inhibitor antidepressant that must be tapered very slowly with medical monitoring.   If the medical findings conclude that this is a rhythm problem it might be addressed via medication, pacemaker implant, or some combination.   The diagnostic procedures and initiation of a treatment protocol should be completed by physicians familiar with Armitage and his complicated medical situation.  Dr. Paone also has specific concerns regarding the impact of possible incarceration on his condition, and special concerns and advice learned from the diagnosis and treatment will be imperative to any facility medical personnel.

Armitage's marriage has literally and totally disintegrated under the stress of these charges.  As his own family support system has deteriorated, Armitage's human contact has

become limited to his doctor's, his lawyers and a very few individuals who still value his business acumen.

As a result of this offense, Armitage has suffered the loss of his business, his professional reputation, and his ability to work in the energy industry.  Though he was an extremely successful entrepreneur from 1992 to 2006, he has been permanently barred from participating in any federally funded projects and therefore will never again be able to engage in this type of activity again.

### 8.   *Advisory Guidelines Range.*

The United States Probation Office has calculated a guideline range of 78 to 97 months. This range is based on an adjusted offense level of 28 and Criminal History Category I.  This advisory range should not be heeded because it (1) is the product of a fraud guideline not based on empirical data and subject to withe fraud guideline is not based on empirical data and has been severely criticized; (2) would result in a sentence disparate from similarly situated defendants in other fraud cases; (3) fails to take proper account of Armitage's mental health issues, age, first offender status, efforts at cooperation, collateral punishment, and especially low risk of recidivism; and (4) is far greater than necessary to promote the goals of sentencing in this case. As noted, the government, in this case, has asserted that the advisory guidelines for Armitage should be (based upon a total offense level of 28) a sentence of 78 to 97 months.  Again, and respectfully, this assertion for a first time offender with no criminal record who has committed a non-violent crime, and who personally has not "gained" financially from the proposed loss from his criminal conduct, is both disproportionate and extreme.  The government will assert that the loss amount in this case, coupled with their perception that Armitage obstructed justice, mandates a sentence approaching the statutory maximum.  The government fails in their credibility in asserting such a

recommendation.  The end result of their calculations under §2B1.1 leads to an absurd result that a first-time, non-violent fraud offender being subject to a sentence as high as, and sometimes even higher than, those imposed on the most violent offenders (*e.g.*, individuals sentenced for murder-for-hire, armed robbery, arson, volume drug importation/distribution, and even voluntary manslaughter). *Compare* USSG §2B1.1 (2001) (offense level of 28 based only on base offense level and amount of financial loss over $2.5 million) *with* USSG §2A4.1 (2001) (offense level of 24 for kidnapping), USSG §2K1.4 (2001) (offense level of 24 for arson creating substantial risk of death or serious bodily injury), USSG §2D1.1 (2001) (offense level of 24 for trafficking in over 100 kg of marijuana) *and* USSG §2A1.3 (2001) (offense level of 25 for voluntary manslaughter).  Moreover, the mean federal sentence of imprisonment for fraud convictions of defendants in the United States was 21.6 months in 2008. *United States Sentencing Commission, Sourcebook of Federal Sentencing Statistics, 2008, Table 13.*  In 2009, the mean sentence for fraud was 21.9 months.  *United States Sentencing Commission, Sourcebook of Federal Sentencing Statistics, 2009, Table 13.*  Yet here, in 2011, the government urges a sentence of up to the maximum eight years in prison for an individual who realized no actual financial gain.

## II.   <u>LAW AND ARGUMENT</u>

The defendant respectfully asks the Court to impose a sentence of 24 months of home confinement and a period of supervised release.  In seeking a sentence below the applicable advisory guideline range sentence the defendant notes that the United States Sentencing Guidelines, as promulgated by the United States Sentencing Commission, no longer bind federal courts. *United States v. Booker, 543 U.S. 220, 259 (2005).*  Indeed, the United States Supreme Court's landmark *Booker* decision declared the mandatory provisions of the USSG unconstitutional. *Id. Booker*, however, reaffirmed a sentencing court's duty to sentence a

defendant in accordance with those provisions of the Sentencing Reform Act specified in 18 U.S.C. §3553(a).

The §3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense. *United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005)*. The district court, while not bound by the guidelines, still must consult and consider them when imposing a sentence. *Booker, 543 U.S. at 264*. Courts of appeals cannot disturb a district court's sentence unless the appellate court finds that sentence unreasonable. See *Id.* The United States Supreme Court clarified post-*Booker* sentencing procedure in *Gall v. United States, 128 S. Ct. 586 (2007)* where the *Gall* Court indicated that when sentencing a defendant,

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that

a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*128 S. Ct. at 596-597* (internal citations and quotations omitted).

While the First Circuit has noted that sentencing courts must employ "an increased degree of justification commensurate with an increased degree of variance", from the advisory sentencing guideline range, it has also held that under a post-*Gall* rubric, "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion." *United States v, Martin, 520 F.3d 87 (1st Cir. 2008).* Indeed, after *Gall*, the sentencing inquiry-once the court has duly calculated the GSR-ideally is broad, open-ended, and significantly discretionary. At that point, sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." *Id. At 91-92* (internal citations and quotations omitted) (affirming a 91-month downward deviation from the advisory sentencing guideline range).

Here, Armitage asks the Court to exercise its significant discretion and sentence him to a 24 month period of home confinement in lieu of incarceration. Armitage recognizes the wrongfulness of his conduct and acknowledges that his criminal actions require him to pay a significant debt to society. He stands ready to pay that debt. Nonetheless, a period of home confinement is significant for anyone with no prior criminal record, who personally "netted" a small portion of the actual loss as a result of his criminal conduct. It punishes him proportionately to the crimes he committed and sends a powerful message to others who might be inclined to engage in the same type of fraud that such conduct will not be tolerated. He realizes he punishment. In a home confinement situation he would be able to reasonably manage his continued work at home and be subjected to any restrictions the court may

impose.  His ability to work at home will allow him the opportunity to satisfy his restitution obligations.  His success and compensation depend upon the success of the projects he works on. Incarceration would result in his inability to complete the necessary efforts to ensure compensation and terminate his ability to make substantial restitution.  He simply asks that this Court to impose a sentence that unnecessarily penalizes his family and jeopardizes his ability to return to society as a productive citizen.

The advisory guideline range in this case is far greater than necessary to satisfy the goals of sentencing. The harsh sentencing recommendations of §2B 1.1 are not based on past practice or empirical data and have been increasingly rejected by sentencing courts in fraud cases. Armitage's advisory guideline range is considerably longer than the sentencing range he would have faced under the original guidelines adopted in 1987. Over the past twenty years, the Sentencing Commission has dramatically increased the severity of sentences for fraud offenders by raising the number of points imposed for the amount of loss *and* by approving an expansion in the number of specific offense characteristics. Because the Commission failed to cite empirical data when making these changes – and thus failed to fulfill its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with §2B1.1's sentencing recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "short" but definite period[s] of confinement."

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing* Reform, at 56 (Nov. 2004)[hereinafter *Fifteen Year Report*]. The Commission thus reduced the availability of probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in prison. To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).  But, as noted above, the Commission has abandoned its original goal of ensuring "short but definite" sentences, and has instead steadily increased the prison sentences for all forms of fraud. The Commission has adopted this radical shift in sentencing policy without the support of any empirical data demonstrating the value of its substantial increases in sentence severity. *United States v. Aldelson*, 4441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.") Because the Commission failed to cite empirical data – and thus failed to fulfill its institutional role – sentencing court have tremendous discretion to disagree, on policy grounds, with § 2B1.1's recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a

particular case"). And indeed, "since *Booker*, many judges faced with a fraud defendant have concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in fraud cases] and the fundamental requirement of Section 355 3(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at 4 (Feb. 2008).

Courts have substantially varied from the guideline range based on: (1) policy disagreements with §2B 1.1's sentencing recommendations, (2) concerns about unwarranted disparities *vis-à-vis* the many courts who have declined to impose within-guidelines sentences in fraud cases, and/or (3) mitigating aspects of a particular defendant's history or the nature and circumstances of his/her offense. As discussed at greater length below, these very same factors weigh in favor of a statutory sentence below the advisory guideline range in Michael Armitage's case.

## A. The lengthy sentences, under § 2B1.1, for fraud defendants do not reflect sound policy.

When the Sentencing Commission fails to fulfill "its characteristic institutional role" of developing a particular guideline, or its later amendments, based upon empirical data, national experience, or some rational policy basis, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007). Similarly, when the Commission acknowledges problems with a particular guideline but fails to make appropriate modifications, a sentencing court has

24

greater latitude to sentence outside the advisory range. *Id.* (upholding below-guidelines sentence based on policy disagreement with crack/powder disparity where Commission itself had reported that the disparity produced disproportionately harsh sanctions).

The Commission has dramatically increased sentence length for fraud offenders in the face of overwhelming social science research showing that such increases in severity have little, if any, deterrent value. In promulgating the various sentence increases for fraud offenses over the past twenty years, the Commission has offered no empirical data to rebut the virtual consensus in the social science community disputing the deterrent value of such increases. Offenders like Armitage thus face sentences seven times greater than called for by the original guidelines even though they would be equally deterred by much shorter sentences.

When the Guidelines were first adopted in 1987, the fraud guideline, then §2F1.1, provided just a small number of enhancements for specific offense characteristics. USSG §2F1.1 (1987). Besides the amount of loss, the original §2F1.1 imposed enhancements if the offense involved (1) more than minimal planning; (2) more than one victim; (3) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization or government agency, (4) the violation of a judicial or administrative order, or (5) the use of foreign bank accounts/transactions to conceal the nature or extent of the fraudulent conduct. In short, the original fraud guideline provided only six possible enhancements above the base offense level.

Over twenty years later, §2B 1.1 – the current fraud guideline – includes nearly thirty different enhancements for specific offense characteristics. USSG §2B 1.1 (2008). And yet, "the [Sentencing] Commission has never explained the rationale underlying *any* of its

25

identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (quoting Kate Stith & José Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Furthermore, the Commission has failed to address the problem that many of these factors replicate or overlap with the loss concept, with one another, and with further upward adjustments in Chapter 3. In its *Fifteen Year Report*, the Commission acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." *Fifteen Year Report* at 137. But the Commission has done nothing more than identify the risk of what it labeled "factor creep"; it has not taken any action to evaluate which factors might be cumulative and whether its ever-expanding scheme of sentencing factors under §2B 1.1 produces sentences greater than necessary to achieve the goals identified in 18 U.S.C. §3553(a).

Though the Commission itself has failed to remedy the problem of "factor creep," an increasing number of courts have declined to sentence within guideline ranges that are the products of overlapping specific offense characteristics. *See, e.g.*, *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" in the fraud sentencing table); *Adelson*, 441 F. Supp. 2d at 506, 510; *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (complaining that guidelines in security fraud prosecutions "are patently absurd on their face" due to the "piling on of points" under §2B 1.1). In *Adelson*, for example, the district court found that the "calculations under the

26

Sentencing Guidelines lead to a result [*i.e.*, an effective life sentence] so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." 441 F. Supp. 2d at 506. The *Adelson* court criticized the Commission for failing to explain "the rationale underlying *any* of its identified specific offense characteristics" under the fraud guideline and characterized §2B 1.1's overlapping enhancements as an irrational "piling on of points." *Id*. at 510.

Furthermore, a growing chorus of legal scholars has offered their own criticism of the increasingly harsh sentences that result from the large number of specific offense characteristics inevitably present in every fraud case. Professor Frank Bowman, for example, explains that "[m]any factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself…." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at 7 (Feb. 2008). As a result, Bowman adds, "[a]ny case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a fraud in a corporate setting." *Id.*

Moreover, though the Commission has made the amount of loss the determinative factor in the offense level calculation for fraud offenders, loss amount is a highly imperfect measure of the seriousness of the offense. *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is

appropriate to accord such huge weight to [this] factor[ ]"). The specific amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). Most defendants do not set out to defraud a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the ongoing fraud happens to be detected. *Id.* As the *Emmenegger* court explained: "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id.*  This Court should look to the all of the § 3553(a) factors, and the empirical data not considered by the Commission, in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the various purposes of sentencing.

**B. Several aspects of Armitage's offense and his individual characteristics also support a variance.**

A sentencing court "may not presume that the Guidelines range is reasonable," *Gall*, 128 S. Ct. at 596-97, and cannot "require 'extraordinary circumstances to justify a sentence outside the Guidelines range." *United States v. Bolds*, 511 F.3d 568, 580-8 1 (6th Cir. 2007). The district judge 'must [instead] make an individualized assessment based on the facts presented' and upon a thorough consideration of all of the §3553(a) factors." *Id.* at 580 (quoting *Gall*, 128 S. Ct. at 597). Although the Sentencing Commission "fills an important institutional role" in promulgating the Guidelines, the sentencing judge "has greater familiarity with the individual case and the individual defendant before him . . . [and] is therefore in a superior position to find facts and judge their import under §3553(a) in each particular case." *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (internal

quotations and citations omitted).

This Court has discretion to deviate from the Guidelines, a variance is especially appropriate in Armitage's case because of the following mitigating aspects of his individual history and characteristics.

### 1. *Armitage's primary motivation was not greed.*

Armitage's motive for committing his crime is relevant at sentencing. *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). Under a court's mandatory analysis of the §3553(a) factors, motive is part of the "nature and circumstances of the offense" and must be considered. *United States v. Mahan*, 2007 WL 1430288, at *3 (10th Cir. 2007) (unpublished) (finding sentence procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.*, that he had just been violently beaten by three men and sought to defend his wife). Accordingly, a number of courts have granted departures or variances where a fraud defendant was motivated by something other than a desire for profit of personal financial gain. *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance below guidelines' recommendation where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (considering mitigating evidence that defendant in bank fraud case had "not act[ed] for personal gain or for improper personal gain of another").

Here, Armitage began withdrawing funds from EVW accounts in an effort to fulfill the stated mission of EVW to develop a workable and marketable battery that would have dramatic effects in its potentially endless applications, which would have a positive impact

on the environment.  His failure to file tax returns and timely pay his taxes was based on an incorrect understanding that he did not owe much in taxes and if they were paid later, he would be obligated for penalties and interest, but that it was not criminal.  In Armitage's efforts to develop EVW's battery, he used all available funds to support his business ventures believing that financial success was just around the corner and he would square away his taxes.  The very skill that made Armitage a very successful entrepreneur ended up being his biggest flaw, "unfettered optimism".  Always the optimist the thought that he was doing anything wrong never entered his thought process as he always believed he would just pay his taxes.  The Court must keep in mind that Armitage suffers from various mental health disabilities.  His mental health issues not only amplified his feeling of desperation over the difficulties EVW encountered but also clouded his ability to discern appropriate responses.

Armitage does not dispute the fact that he used some funds for personal expenditures.  Though his initial motive was not one of personal greed, he did use funds to maintain his standard of living for him and more importantly for his family.  Armitage always believed EVW would be successful and the bulk of the appropriated funds were used to fulfill EVW's mission.  Moreover, Armitage did not set out to permanently deprive the Government of its funds and, even near the end he was trying to figure out a way to make EVW a successful venture.  He genuinely believed that this EVW would generate a product that would generate tremendous financial revenue which would allow EVW to pay all its debts and Armitage as well, including his taxes.  Armitage was so intimately involved in the operation of EVW he became its alter ego and the line between EVW's funds and his funds became blurred.

In short, Armitage's case is distinguishable from the run of the mill fraud case in which a defendant misappropriates large sums of money for the sole purpose of supporting a lavish lifestyle. Though Armitage's actions were fraudulent, his motive was to attempt to balance his and his family's lifestyle and to keep EVW viable as a successful project. His actions were taken with a complete misunderstanding of the technical aspects of the grant requirements in that among other errors he was allowed to access his loaned funds for personal and/or other business because that is how he had always done it in the private sector. Armitage never doubted that EVW would succeed in the end and he would eventually ensure that EVW would produce a working product and all investors would reap the benefits as they had enjoyed in the past. Indeed, without Armitage's personality traits many of his past projects would have never come into existence. For example, the Berkshire Power Plant in Agawam and others in Connecticut would have never been constructed had it not been for Armitage. The Court should take this entire picture into account in fashioning an appropriate sentence.

Armitage's actions are perhaps best characterized by Michael S. Zarin a very distinguished business man that has dealt with Armitage for over twenty (20) years on an almost day to day business level. Attached is a letter from Michael S. Zarin dated November 9, 2011 with its attachment.

### 2. *As a 58 year-old, first-time offender, Armitage has an exceptionally low risk of recidivism.*

Both the age of an offender and his/her first offender status are powerful predictors of the likelihood of recidivism. Indeed, the Sentencing Commission has itself recognized that (1) recidivism rates decline dramatically with age, and (2) first-time offenders

are even less likely to reoffend than defendants with a limited criminal history who also fall within Criminal History Category I. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13- 14 (May 2004) [hereinafter *First Offender Report*]. The Commission's research has, for example, demonstrated that a 20 year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, while a 58 year-old defendant with the same criminal history has only a 6.2% chance of recidivating. *Measuring Recidivism Report*. With respect to first offenders, the Commission has found that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%. *First Offender Report* at 13-14.

Despite these clear and compelling findings, the Commission has failed to revise the Guidelines to take either age or first-offender status into account. The Commission clearly recognized the advisability of revising the Guidelines to take these factors into account. *See First Offender Report* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure); *Measuring Recidivism Report* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). But, in the seven years since publishing its *Fifteen Year Report*, the Commission has taken no action toward implementing such revisions.

In response to the Commission's inaction, a growing number of courts have themselves taken both age and first-offender status into account when fashioning an

appropriate sentence under 18 U.S.C. §3553(a). *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding sentence in child pornography case as reasonable where district court granted downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (explaining that sentence of 262 months – as opposed to Guidelines sentence of 324 to 405 months – constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant); *United States v. Nellum*, 2005 WL 300073 at 3 (N.D. Ind. Feb. 3, 2005) (explaining that age of offender is relevant to §355 3(a) analysis, even if not ordinarily relevant under the Guidelines, and granting variance to 57 year-old defendant); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first – *i.e.*, the charged – act).

Armitage is 58 years old and has no prior history of criminal behavior. The Sentencing Commission has recognized that an offender within his age range – and with his lack of any criminal record – is extremely unlikely to recidivate.  Given Armitage's extraordinarily

low risk of recidivism, a within-guidelines sentence of 78-97 months is simply greater than necessary to protect the public from the small chance of his committing future crimes. Such a lengthy sentence would only serve to provide "just deserts" at a very high cost to the American taxpayer while hindering Armitage's ability to make restitution to the Federal Government. Moreover, because it is the certainty, not the severity, of punishment that best serves as a general deterrent to the public at large, a sentence substantially below the advisory range would more than adequately fulfill §553(a)(2)(B)'s goal of "afford[ing] adequate deterrence to criminal conduct."

### 3. *Armitage's criminal conduct was aberrant in light of the many years of his adult life he lived as a law-abiding citizen.*

In the Sentencing Reform Act, Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. §994(j). In response, the Commission "redefin[ed] 'serious offense' in a way that was entirely inconsistent with prior practice, and not at all based on any real data or analysis," and thereby substantially increased the incarceration rate for non-violent first offenders above pre-guidelines rates. *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007).

The Commission acknowledged that the guidelines failed to address "single acts of aberrant behavior that still may justify probation at higher offense levels through departures." *See* USSG Ch.1, Pt. A, intro comment. §4(d). Seizing on the Commission's statement, courts stepped in to fill in the gap, creating their own downward departure for offense conduct that constituted aberrant behavior. Though some circuits limited the availability of their aberrant

34

conduct departure to defendants guilty of a "spontaneous, thoughtless, single act involving lack of planning," *see, e.g.*, *United States v. Marcello*, 13 F.3d 752 (3d Cir. 1994), other courts took a more expansive approach by looking at the totality of the circumstances and not automatically excluding defendants whose uncharacteristic conduct was comprised of more than a single, unplanned criminal act. *See, e.g.*, *United States v. Grandmaison*, 77 F.3d 555 (1st Cir. 1996).

In 2000, the Commission finally adopted its own aberrant conduct departure. *See* USSG §5K2.20. In doing so, however, the Commission failed to consider empirical data or the many policy questions relevant to how first-offenders should be sentenced. Instead, the Commission simply reviewed the approaches already being taken by the courts, considered general recommendations from the criminal justice community, and then elected to adopt a restrictive approach that limited eligibility to "single criminal occurrence[s] or single criminal transaction[s]." *Id*. The Commission "*did not* study the relationship between the varying court definitions or aberrant behavior and the statutory purposes of sentencing," "evaluate alternatives to incarceration for non-violent first offenders," or explain why it adopted various exclusions or definitions." *Germosen*, 473 F. Supp. 2d at 228-29. In a conclusive manner, the Commission merely "announced *what* it had done." *Id*. at 229.

The Court has the authority to reject §5K2.20's restrictions on the availability of the aberrant conduct departure. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). Armitage lived a law-abiding life until he was in his mid-50s and engaged in the charged

fraud. He was widely regarded as a loving husband, routinely provided to charities and a genuinely good person.  Armitage's crimes are completely uncharacteristic when viewed in the context of his entire productive adult life. This Court should, therefore, grant a departure or variance based on the aberrant nature of his conduct.

### 4. Due to the loss of his job and other opportunities, Armitage will never be able to commit a future crime of corporate fraud.

In fashioning a sentence that adequately deters the defendant from future criminal conduct, it is highly relevant to consider whether the defendant will even be able to commit future crimes like the one for which he is being prosecuted. In *United States v. Olis*, for example, the district court considered that the defendant was substantially incapacitated from committing future crimes of fraud by the loss of his corporate job and professional licenses. 2006 WL 2716048, at 13 (S.D. Tex. Sept. 22, 2006) (unpublished). In granting a substantial variance below the advisory range, the *Olis* court explained: "Once [the defendant] returns to his family, the chastening effect of prison, the attendant negative publicity, the loss of his job, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct." *Id.*

Like the defendant in *Olis*, Armitage will be unable to commit future crimes of corporate fraud upon his release from custody. He will never be able to participate in the affairs of any company associated with any federal grant and likely, not ever serve as an officer, director of any publically traded corporation.  A long sentence is not necessary to incapacitate Armitage, as the collateral effects of his actions have already done so and therefore, the advisory guideline range of 78 to 97 months is simply *much* greater than necessary.

**5.   *Armitage will be better able to make restitution to the Federal Government if he is sentenced to a short term of imprisonment and long term of supervised release.***

In considering the length of a prison sentence, a sentencing court may consider how its sentence will affect the defendant's ability to make financial restitution. *See* 18 U.S.C. §3553(a)(7) (cataloging "the need to provide restitution to any victims of the offense" as one factor to consider in formulating sentence); *see, e.g., United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probation sentence as the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by non-incarcerated and employed defendant"). In *United States v. Peterson*, for example, the district court's central justification for varying from the guidelines was to facilitate the defendant's payment of restitution. 363 F. Supp. 2d 1060, 106 1-62 (E.D. Wis. 2005). The defendant had stolen checks from his employer, forged signatures on the checks, and deposited them into his sister's bank account. *Id.* at 1061. He pled guilty to bank fraud in the amount of $81,000. *Id.* The district court elected to grant a variance from the advisory guidelines range of 12 to 18 months imprisonment and instead sentenced the defendant to "one day in prison, followed by a substantial period of community confinement as a condition of five years of supervised release." *Id.* In explaining its variance from the guidelines, the district judge said:

> If I had sentenced defendant consistent with the guidelines, he would have lost his job. This would have impaired his ability to repay the money he stole. I do not suggest that a defendant should receive a break just because he owes restitution. But in the present case, where defendant had a reasonably well-paying job and the restitution amount was manageable, §3553(a)(7) weighed in favor of a sentence that would allow him to remain in the community and working.

*Id.* at 1062.

Armitage is a smart, self-educated, hardworking man with a developed unique ability to create and develop large scale technically complicated projects. Due to his personal charm, likeability, and high energy level, he was extremely successful and was engaged in the many successful endeavors prior to joining EVW. There is every reason to believe that, even with a criminal conviction, he will be able to get a reasonably well-paying job upon his release and make substantial restitution to the Federal Government.  If, however, Armitage is sentenced within the advisory guideline range, he will not get out of prison until he is well past retirement age.  At that point, his age, likely health issues, and life expectancy will make it nearly impossible for him to make meaningful restitution.

Though the Government in this case has called for a long prison sentence, they have also stressed the importance of restitution. Armitage is very remorseful and wants to devote the remainder of his working life to making amends to the Federal Government. In fashioning an appropriate sentence, this Court should seek to maximize, rather than eliminate, Client's ability to make the restitution the victims have demanded.

### 6. *Armitage attempted to cooperate with the Government and offered substantial assistance.*

A defendant's efforts to cooperate with authorities provide grounds for a variance below the advisory range even when such efforts do not qualify for a formal departure under §5K1.1. *See*, *e.g.*, *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (acknowledging sentencing court's discretion to consider attempts at cooperation even if such attempts did not yield government motion under §5K1.1). And, a wide range of cooperating conduct has been deemed worthy of a sentencing court's consideration. *See*, *e.g.*, *United States v. Patillo*, 817 F. Supp. 839, 846 (C.D. Cal. 1993); *United States v. Hoffenberg*, 1997

WL 96563, at 12 (S.D.N.Y. March 5, 1997) In *Patillo*, for example, the "defendant, underling in the drug trade, [was not] in a position to [identify] the control persons in the chain of command in the drug trade." 817 F. Supp. at 846. He did, however, provide assistance to the authorities during the Los Angeles riots and, in the process, ensured the personal safety of his probation officer. *Id*.  Though his assistance did not trigger a §5K1.1 motion, the sentencing court nevertheless found that it provided grounds for a lower sentence. *Id*. Similarly in *Hoffenberg,* the sentencing court found a downward departure appropriate where the defendant had offered substantial assistance in civil litigation related to his crimes of fraud. 1997 WL 96563 at 12. The defendant had, as CEO and President of Towers Financial Corporation, engaged in a large-scale fraud that eventually resulted in Towers' bankruptcy. *Id*. at 1-7. His later cooperation in the civil litigation helped victims of his fraud recover losses against Towers. *Id*. at 12.

Armitage offered meaningful cooperation. In good faith, Armitage met with the government agents and prosecutors and honestly answered their questions about the potential involvement of other individuals they were interested in.  Nevertheless, the Government declined to file a motion for a downward departure under §5K1.1.  Armitage's cooperation should be taken into account at sentencing.  His efforts to help the Government demonstrated his genuine remorse and his acceptance of responsibility.  These post-offense steps towards rehabilitation indicate a low risk of recidivism and positive aspects of his character.

7. ***Armitage has already been punished collaterally as his health continues to deteriorate and he has lost his profession and reputation.***

When a defendant suffers consequences for his criminal conduct – apart from the

sentence imposed through the criminal court process – the sentencing court can take this collateral punishment into account in fashioning an appropriate sentence. *See e.g. United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as result of EPA-related charges); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant in public corruption case was already collaterally punished by loss of his position, loss of his reputation, widespread media coverage of his case, and the emotional toll of two lengthy, public trials). In *United States v. Samaras*, for example, the district court granted a variance from the Guidelines in part because the defendant had lost a good public sector job as a result of his conviction. 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005). Variances or departures on this basis have been justified because the collateral punishment itself satisfies the specific and general deterrence objectives of §3553(a), without the need for the full range of punishment called for by the Guidelines. *Gaind*, 829 F. Supp. at 671.

Armitage has already suffered in the wake of his indictment and this collateral punishment must be taken into account at sentencing. He has lost his business, his professional reputation, and his ability to work not only in the energy production field but with just about every major corporation.  In short, Armitage has suffered as much or more than the defendants, in the above-cited cases, who received variances based on collateral punishment. During the pendency of this investigation and indictment individuals associated with the prosecution and the government contacted numerous business associates with Armitage and institutions with whom he dealt.  They were advised and warned that it would not be in their organization's interests to continue or contemplate doing business with him.  On occasion the

head of Business Development for the State of Louisiana was contacted and warned that continuing to conduct business with Armitage was not advisable. As a result Armitage was prevented from developing two oil related energy projects worth hundreds of millions of dollars even though he had already devoted substantial time and energy to the projects. As a result of the adverse media, the government's actions in actively reaching out to individuals, businesses and government bodies associated with his ability to earn money has essentially evaporated since the government's investigation began almost five (5) years ago. In fashioning an appropriate sentence, this Court should consider Armitage's professional and reputational loss and the enormous amount of media coverage.

### 8. *Armitage's Psychological Evaluation.*

District courts enjoy substantial discretion in considering all aspects of a defendant's history and characteristics in fashioning an appropriate sentence. Consistent with this discretion, a sentencing court can vary or depart below the advisory range based on a defendant's mental health problems. *See, e.g.*, *United States v. Mendez*, 248 Fed. Appx. 653, 661 (11th Cir. 2008) (unpublished) (granting modest reduction in sentence on basis of defendant's "mental problems").

Armitage was evaluated by Dr. Howard Lester. According to Dr. Lester's findings and opinions Armitage meets the criteria for the following diagnoses: Major Depressive Disorder and Alcohol Abuse (the latter presently in remission). In Armitage's case the Major Depressive Disorder diagnosis is characterized by unrelenting sad, irritable mood, spontaneous crying, loss of interest or pleasure in activities (anhedonia), increased appetite with weight gain, psychomotor retardation, decreased energy, difficulty thinking, and concentrating, at least one episode of suicidal ideation, and anxiety. His anxiety has been severe and episodically

41

debilitating.   Prominent anxiety is commonly seen in individuals suffering from Major Depression.   Armitage has experienced "attentional and memory problems since childhood, and he may well have met the criteria for the diagnosis of Attention Deficit Disorder (ADD)."   However, his adult experiences of distractibility and memory deficit do not meet the criteria for adult ADD.    As an adult, Armitage's experiences with distractibility and forgetting flow from a mix of residual deficits (as demonstrated on neuropsychological testing) and his depression.  *The Report of Dr. Howard Lester[1]. P13.*  The diagnosis of Alcohol Abuse, presently in remission, is based on the observations offered by several collateral contacts, including his wife.   Armitage having been a heavy drinker denies that alcohol has impaired his functioning. But those interviews established,  independently,  a pattern  of moderate to heavy drinking  that extended over  a period  of many  years, and worsened  considerably  during  the last  few until he finally stopped or cut back significantly last winter.  *Id.*

In  addressing  the tax  issue  Dr.  Lester  found  that  to be  a  complicated  analysis.   In summary he found that at an early age Armitage learned that procrastination could be a useful fault; one that he employed when it came to his struggle with academics and with his father. Also from an early age he developed a fierce dislike for being forced to do something. That's why he always worked for himself.  Given his success over the years at such energy and time consuming projects this was evident in his work.  As Armitage recounted his work history and various projects and encounters, and after speaking with his associates, it became clear to Dr. Lester that Armitage's procrastination and avoidance, or simply ignoring important tasks, was a problem. It required intervention by others when it came to the ongoing management of projects.

---

[1] The Forensic Psychological Evaluation authored by Howard M. Lester, Ed.D. has been submitted under seal to the court and not as an ECF exhibit.  AUSA Grant has been provided a copy of the report via e-mail.  Dr. Lester has also authored an addendum which will be filed under seal simultaneously with this memorandum and a copy will be provided to AUSA Grant.

After not filing his taxes legitimately for several years, given his tendency to procrastinate and distaste for "being forced," Dr. Lester found that he would have been naturally resistant to starting again.  As time went by and the problem snowballed, there were plenty of preferable distractions always demanding Armitage's immediate attention.  In addition his regular use of alcohol would have served to reduce any anxiety related to his avoiding the problem, while at the same time dampening his better judgment. *Id. at 15*.

This Court should consider the fact that Armitage undertook his actions while suffering from severe mental health issues and severe emotional trauma.  Armitage became involved with EVW as a legitimate business. However, during his tenure with EVW he began to co-mingle funds and the line between what was legitimately his and what was EVW's became blurred, and the hole simply became deeper and deeper.  Armitage was always hopeful that the business was going to become successful in time and eventually profitable enough so eventually everyone would benefit.  Armitage made extremely poor judgments in his misappropriation of funds from EVW and his failure to file tax returns.  These misjudgments must, however, be seen in light of the mental health issues and personality disorder that Armitage was suffering.  A sentence within the advisory guideline range is far in excess of what is fair and just in this case and would not take into account Armitage's mental health issues.  A departure or variance is, therefore, needed to avoid such an unjust result.

### III.    <u>CONCLUSION</u>

For all the foregoing reasons, the Defendant Michael J. Armitage respectfully requests that an alternative sentence of home confinement and supervised release be imposed with an order for full restitution.

Dated: November 14, 2011    Respectfully submitted,


        The Defendant
        MICHAEL J. ARMITAGE
        By His Attorneys,

        */S/ Raipher D. Pellegrino*

        Raipher D. Pellegrino, BBO# 560614
        rpellegrino@dennerpellegrino.com
        Charles E. Dolan, BBO# 546344
        cdolan@dennerpellegrino.com
        Denner Pellegrino, LLP
        265 State Street
        Springfield, MA  01103
        Tel. No. (413) 746-4400
        Fax No.  (413) 746-5353


### Certificate of Service

  I, Raipher D. Pellegrino, hereby certify that by filing the foregoing *Sentencing Memorandum* via the CM/ECF system on this 14th day of November 2011, I caused a true copy of the same to be served electronically upon all parties of record registered with CM/ECF.


        */s/Raipher D. Pellegrino*
        Raipher D. Pellegrino